L.W. v J.U. (2024 NY Slip Op 50879(U))

[*1]

L.W. v J.U.

2024 NY Slip Op 50879(U)

Decided on July 9, 2024

Supreme Court, Westchester County

Hyer, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 9, 2024
Supreme Court, Westchester County

L.W., Plaintiff,

against
J.U., Defendant.

Index No. XXXXX

Counsel for the mother/plaintiff, L.W.: Evan Wiederkehr, Esq. & Shira Krance, Esq., The Wiederkehr Law Group, P.C.1 North Lexington Avenue, 11th Floor, White Plains, New York 10601
Counsel for the father/defendant: J.U. Massimo DiFabio, Esq., DiFabio & Associates, P.C., 2500 Westchester Avenue, Suite 109, Purchase, New York 10577 
Attorney for the child: Donna E. Abrams, Esq., Harold Salant Strassfield & Spielberg, 81 Main Street, White Plains, New York 10601

James L. Hyer, J.

Relevant Background & Procedural History
The parties were married on [Redacted], in [Redacted], State of New York. There is one Child of the marriage, A.U. (D.O.B.: [Redacted]) (hereinafter referred to as the "Child"). On September 6, 2018, this action was commenced by Plaintiff, with the filing of a Summons with [*2]Notice, seeking relief, inter alia, for the dissolution of the parties' marriage (NYSCEF Doc. No. 1). On December 14, 2018, a Request for Judicial Intervention was filed (NYSCEF Doc. No. 3). On January 23, 2019, an Order Appointing Attorney for the Child was entered appointing [Redacted], as counsel for A.U. (NYSCEF Doc. No. 20).
On February 1, 2019, Defendant appeared in this action with his then legal counsel filing a Notice of Appearance (NYSCEF Doc. No. 21). On February 21, 2019, the parties entered into a Preliminary Conference Stipulation/Order, wherein the parties agreed that the parties' marriage would be dissolved, pursuant to New York State Domestic Relations Law (hereinafter referred to as "DRL") § 170(7), in that the parties' marriage had irretrievably broken down for a period in excess of six months (NYSCEF Doc. Nos. 28, 29).
On September 11, 2020, the parties entered into a Parenting Agreement on Consent, which was executed by both parties and the attorney for the Child, and "so ordered" by the Court, (hereinafter referred to as the "Parenting Agreement") (NYSCEF Doc. No. 88). The Parenting Agreement provides that both parties have joint legal custody of A.U., with both parties having an affirmative obligation to consult with each other regarding major decision-making pertaining to A.U., and the parent with whom the Child is with at a particular time shall make day-to-day decisions but shall endeavor to cooperate to establish a mutually agreeable policy regarding day-to-day decisions. It was further agreed that Plaintiff would have primary physical custody of A.U., subject to an access schedule set forth therein of Defendant.
The Parenting Agreement requires that both parties engage in efforts to foster a good relationship with between A.U. and the other parent:
"3(c). [ ] The Husband and Wife shall endeavor to guide the Child so as to promote an affectionate relationship between the Child and the other parent. Neither party shall do anything which may alienate the other from the Child or injure the opinion of the Child as to the other party or which may hamper the free and natural development of the love of the Child for the other party.
* * *
23. Each of the parties hereto acknowledges that the best interests of the Child is preeminent to each of them, and to that extent that her welfare and happiness supersedes all other issues herein involved. Each parent agrees to respect and/comply with the Child's rights set forth below:

 CHILD'S BILL OF RIGHTS
(A) The right not to be asked to 'choose sides' between their parents.
(B) The right not to be told the details of bitter or nasty legal proceedings going on between their parents.
(C) The right not to be told 'bad things' about the other parent's personality or character.
(D) The right to privacy when talking to either parent on the telephone.
(E) The right not to be cross-examined by one parent after spending time with the other parent.
(F) The right not to be asked by one parent to tell the other parent untruths.
(G) The right not to be asked to be a messenger from one parent to the other.
(H) The right not to be used as a confidant regarding the legal proceedings between the parents."
Paragraph 12 of the Parenting Agreement provides that, "The Mother and Father agree that they shall not unreasonably interfere with the other's parenting time or the Child's normal [*3]and usual activities, including the Child's normal religious observances, school schedules, attendance, social commitments, recreational activities, counseling or health and education needs or requirements."
The Parenting Agreement sets forth provisions wherein the parties thought process in entering into the agreement is set forth, as well as a confirmation that the parties have thoroughly reviewed the document before signing it:
"1. The parties have carefully considered the question of custody of the issue of the marriage. In so doing, they have been guided solely upon the consideration of the Child's welfare and best interest.

 * * *
IN WITNESS WHEREOF, the parties hereto having read each and every word of this agreement, have hereunto duly signed, executed, and acknowledged this agreement."
On November 13, 2020, a Stipulation of Settlement was executed by both parties, which annexed the Parenting Agreement as Exhibit A, (hereinafter referred to as the "Stipulation of Settlement") (NYSCEF Doc. No. 91). Within the Stipulation of Settlement, the parties confirm the existence of the Parenting Agreement, "Whereas the parties entered into a So Ordered Parenting Agreement on Consent Dated September 11, 2020 (herein referred to as Parenting Agreement) resolving, except to the extent set forth herein, the custodial and access issues with respect to their Child."
Article V of the Stipulation of Settlement provides the only modification of the Parenting Agreement:
"1. The parties entered into a Parenting Agreement on September 11, 2020 which is attached hereto as Exhibit "A." To the extent not modified herein, the parties acknowledge and agree that the Parenting Agreement attached hereto as Exhibit "A" shall be made a part hereof and shall be incorporated but not merged in the Judgment of Divorce. The parties acknowledge and agree that they wish to modify each Party's respective access with A.U. with regard to Memorial Day Weekend, Labor Day Weekend, and Columbus Day Weekend as set forth in the chart below:

 * * *
Notwithstanding the foregoing, neither parent shall have access with the Child for three consecutive weekends. In the event a parent has access with the Child two consecutive weekends, the regular weekend schedule (as set forth in the Parenting Agreement) shall reset and the parent who did not have access with the Child for two consecutive weekends shall have regular weekend access with the Child immediately following the other parent's second consecutive weekend access with the Child. The parties acknowledge that the Summer access schedule supersedes the Regular access schedule and the Holiday access schedule supersedes both the Regular access schedule and the Summer access schedule as set forth in the Parenting Agreement.
2. The parties shall utilize the Family Wizard Software and App to communicate in connection with issues regarding the Child, except in the event of an emergency or time sensitive or urgent matter. Each party shall be solely obliged for their individual cost of same."
Article XVIII of the Stipulation of Settlement confirms that both parties were satisfied with the independent legal counsel they obtained in the negotiation and drafting of the Agreement and that each party read the Agreement carefully and has agreed to its terms free of [*4]any duress, threat, fraud, or undue influence. Article XXIV states, "Except as otherwise provided in this Agreement, no modification or waiver of any provision of this Agreement shall be binding unless made in writing and executed and acknowledged with the same degree of formality as this Agreement or unless stipulated to by the parties upon the record of a court of competent jurisdiction." Article XXV provides that the failure of either party to insist upon strict performance of any term or provision by the other party shall not be deemed a waiver or relinquishment of the right to insist upon strict performance in the future. Article XXVII then confirms that the parties agree that the terms of the Stipulation of Settlement shall be incorporated by reference, but not merged, into a Judgment of Divorce to be entered by the Court. Article XX provides that in the event that either party defaults with respect to any obligation within the Stipulation of Settlement, and the other party is required to seek Court intervention to compel compliance and is successful, the defaulting party shall pay the other's legal fees.
Annexed to and made part of the Stipulation of Settlement are identical signed and notarized Affidavits of each party which confirms the following: (1) that each has read the document word for word, paragraph by paragraph; (2) each understands the document contents; (3) that each understands and appreciates the legal effect of their signature on the document; (4) that the agreement completely and perfectly expresses each party's understanding of the terms of the settlement; (5) that the agreement is the entire understanding and agreement between the parties; (6) that the agreement was reached after mature deliberation and after consultation with counsel; (7) each executed the agreement of their own free will; and (8) the agreement is not a result of collusion (hereinafter referred to collectively as the "Stipulation of Settlement Affidavits").
On January 12, 2021, Findings of Fact and Conclusions of Law was entered (NYSCEF Doc. No. 100) and Judgment of Divorce was entered (hereinafter referred to as the "Judgement") (NYSCEF Doc. No. 99). The Judgement provides that it is, "Ordered and Adjudged that the Stipulation of Settlement dated November 13, 2020, and the So Ordered Parenting Agreement on Consent dated September 11, 2020, copies of each which are on file with the Court and are hereby incorporated by reference, shall survive this Judgment as independent contracts, and shall not be merged into this Judgment, and the parties are hereby directed to comply with all legally enforceable terms and conditions of said Stipulation of Settlement and Parenting Agreement as if such terms and conditions were fully set forth in their entirety herein " On February 2, 2021, a Notice of Entry of the Findings of Fact and Conclusions of Law, and Judgment were filed (NYSCEF Doc. Nos. 101, 102).
On August 21, 2023, Defendant (Petitioner) filed a Family Offense Petition in the Westchester County Family Court under File Number [Redacted] and Docket Number [Redacted] (hereinafter referred to as the "Family Offense Petition"). The Family Offense Petition asserted that:
"3. The Respondent committed the following family offense(s) against me and/or my children, which constitute(s) [Check applicable boxes]: (1) disorderly conduct; (2) harassment in the first or second degree; (3) assault in the second or third degree; (4) strangulation; and (5) menacing in the second or third degree.
[Describe each incident, starting with the most recent incident; state date, time, and location of each incident; specify all injuries and if any weapons were used. Use additional sheets if necessary]:
My son had two altercations with the respondent resulting in physical contact. He left home called me, and I called the police. When I arrived, he was at the end of the road. He ran to my vehicle and his mother would not let him in holding the door, hitting, and then choking him.

 * * *
6. The Respondent has acted in a way I consider dangerous or threatening to me, my children, or any member of my family, in addition to the incident(s) described in question 3, as follows [describe]: Erratic and physical, emotional abuse.

 * * *
10(a). The Respondent threatened [check all applicable boxes]: My child or children [specify]: with a gun or dangerous instrument or object as follows [specify]: hitting, choking."
The Family Offense Petition requests that the Court: (a) adjudge the Respondent to have committed the family offense(s) alleged; (b) enter an order of protection, specifying conditions of behavior to be observed by the Respondent in accordance with Section 842 of the Family Court Act; (c) enter a finding of aggravated circumstances; (d) enter a temporary order of child support in accordance with Family Court Act § 828(4); (e) enter an order directing the parties to appear within seven business days of the filing of this petition for consideration of an order of temporary spousal support in accordance with Family Court Act § 828(4); and (f) order such other further relief as to the Court seems just and proper.
On August 21, 2023, The Hon. [Redacted] entered a Temporary Order of Protection directing Plaintiff to refrain from conduct against A.U. that would constitute a family offense and awarded temporary custody of A.U. to Defendant.
On August 28, 2023, Plaintiff filed an Order to Show Cause, (hereinafter referred to as "Motion Sequence No. 3") (NYSCEF Doc. Nos. 103-120), seeking the entry of an Order:
(1) Removing and consolidating Defendant's Family Offense Petition, dated August 21, 2023, filed with the Westchester County Court under File No. [Redacted], Docket No. [Redacted], with the instant post-judgment proceedings;
(2) Vacating the ex parte Temporary Order of Protection, dated August 21, 2023, issued against Plaintiff;
(3) Issuing a Temporary Order of Protection against Defendant in favor of Plaintiff and the parties' unemancipated son;
(4) Directing Defendant to return the parties' son to Plaintiff's custody immediately;
(5) Determining that Defendant is in breach of the parties' Judgment of Divorce, dated January 8, 2021, which incorporated, but did not merge, the Parenting Agreement, dated September 11, 2020, and Stipulation of Settlement, dated November 13, 2020, by reason of his willful failure and refusal to abide by the access schedule set forth therein, advise Plaintiff of major issues affecting the parties' son and refusal to communicate with Plaintiff in a constructive manner regarding the parties' son;
(6) Modifying the parties' Judgment of Divorce, dated January 8, 2021, which incorporated, but did not merge, the Parenting Agreement, dated September 11, 2020, and Stipulation of Settlement, dated November 13, 20202, by reason of a substantial change in circumstances as follows: (1) awarding Plaintiff sole legal and physical custody of the parties' son; (2) modifying the regular, summer and holiday access schedules to remove Defendant's right to overnight visitation with the parties' son; (3) [*5]directing that Defendant's visitation with the parties' son occur in Westchester County, only, supervised by a Court-appointed supervisor with reports to be issued to the Court; and (4) terminating Defendant's telephone access with the parties' son;
(7) Restraining Defendant from discussing the instant legal proceedings with the parties' son, including, but not limited to, the subject of this application, the relief requested herein and any further documents or information in connection with these proceedings; and
(8) for such other and further relief as this Court deems just, proper and equitable.
On August 29, 2024, the Court conformed Motion Sequence No. 3 (NYSCEF Doc. No. 121); entered an Order of Consolidation of the Family Court Proceeding (NYSCEF Doc. No. 122); and entered an Order Appointing Privately Paid Attorney for the Child, appointing [Redacted] as attorney for A.U. (NYSCEF Doc. No. 123). On August 31, 2023, an Order was entered providing, in part, that pending a final determination of Motion Sequence No. 3 that Defendant shall have physical custody of A.U., with an access schedule set forth for Plaintiff (NYSCEF Doc. No. 128).
On September 8, 2023, a Temporary Order of Protection was entered restraining Plaintiff from engaging in conduct that would constitute a Family Offense against A.U. to remain in effect until September 8, 2024, (hereinafter referred to as the "Temporary Order of Protection") (NYSCEF Doc. No. 132).
On September 11, 2024, Defendant filed a Cross Motion (hereinafter referred to as "Motion Sequence No. 4") (NYSCEF Doc. Nos. 136-138), seeking the entry of an Order:
(1) Issuing a Temporary Stay Away Order of Protection against the Plaintiff in favor of the Defendant and A.U.;
(2) Issuing a Final Stay Away Order of Protection against Plaintiff in favor of Defendant and A.U.;
(3) Continuing the temporary order of sole physical and legal custody of A.U. to the Defendant;
(4) Awarding the Defendant sole physical and legal custody of A.U.;
(5) Modifying the regular, summer and holiday access schedule to allow the Plaintiff to have access with A.U., or in the alternative that access between the Plaintiff and A.U., be supervised by a licensed clinical social worker at the Plaintiff's sole cost and expense;
(6) Modifying the Parenting Agreement, dated September 11, 2020, by reason of a substantial change in circumstances as follows; (a) awarding the Defendant sole legal and physical custody of A.U.; (b) modifying the regular, summer and holiday access schedules so that the access between A.U. be supervised;
(7) Determining that the Plaintiff is in breach of the parties' Judgment of Divorce, dated January 8, 2021, which incorporated, but did not merge, the Parenting Agreement, dated September 11, 2020, and the Stipulation of Settlement, dated November 13, 2020, by reason of her willful failure and refusal to abide by the access schedule set forth therein; and her refusal to abide by the procedures set forth in the Parenting Agreement for Major decisions;
(8) Restraining the Plaintiff from discussing the instant legal proceedings with A.U.; and
(9) For such other and further relief as this Court may deem just and proper in the within circumstances.
On October 23, 2023, a Decision and Order was entered pertaining to Motion Sequence [*6]Nos. 3 and 4, wherein it was directed that the relief requested would be determined following a Hearing to be scheduled and directed that a settlement conference be held on November 14, 2023, at 3:00 p.m. (NYSCEF Doc. Nos. 143, 144).
On November 14, 2023, a Settlement Conference was held, after which an Order was entered directing a Hearing to be held on November 28, 2023; November 30, 2023; and December 4, 2023 (NYSCEF Doc. No. 145). The Order further directed that by November 27, 2023, the parties were to serve and file: (1) Witness Lists; (2) Exhibit Lists, and (3) Copies of all Exhibits.
On November 15, 2023, an Order of Vacatur was entered vacating the Temporary Order of Protection (NYSCEF Doc. No. 146) and an Order was entered directing Plaintiff to refrain from conduct that would constitute a family offense against A.U. to remain in effect until November 15, 2024 (NYSCEF Doc. No. 147).
On November 27, 2023, Defendant's counsel filed a Witness List providing the parties as the sole potential witnesses to be called to testify at the Hearing (NYSCEF Doc. No. 150). Defense counsel failed to file an Exhibit List and copies of Exhibits pertaining to the scheduled Hearing. On November 27, 2023, Plaintiff's counsel filed the following: (1) Witness List enumerating fifteen potential witnesses (NYSCEF Doc. No. 151); and (2) Exhibit List enumerating thirty potential exhibits to be utilized at Hearing with copies of same (NYSCEF Doc. No. 152).
On November 28, 2023, an Order was entered adjourning the Hearing to be held on March 13, 2024, March 14, 2024, and March 15, 2024 (NYSCEF Doc. No. 171).
On March 4, 2024, a Status Conference was held wherein all counsel and parties appeared. During this Conference the parties entered into two stipulations. The first stipulation provided that additional witnesses may be called to testify at the Hearing including: (1) [Redacted]; (2) [Redacted]; (3) [Redacted]; and (4) [Redacted] (NYSCEF Doc. No. 179). The second stipulation provided that all of Plaintiff's exhibits would be marked for identification and moved into evidence on consent on the first day of the Hearing (NYSCEF Doc. No. 181).
On March 7, 2023, Plaintiff's counsel filed an Amended Exhibit List including the addition of two proposed Exhibits, 31 and 32, respectively (NYSCEF Doc. No. 186).
On March 18, 2024, an Order was entered directing, in part, that a Lincoln Hearing would take place on April 1, 2024, at 11:00 a.m., and to the extent either party would like to file proposed questions to be utilized by the Court they were to file the same by March 25, 2024. The Order further limited Post-Hearing Submissions to twenty pages per party and directed all transcripts to be submitted by the parties to the Court (NYSCEF Doc. No. 193).
On March 21, 2024, an Order was entered scheduling the final day of Hearing to be held on April 9, 2024, at 9:00 a.m. (NYSCEF Doc. No. 199).
On April 19, 2024, Post-Hearing Submissions were submitted by the attorney for the Child (NYSCEF Doc. No. 205); Defendant's counsel (NYSCEF Doc. No. 206); and Plaintiff's counsel (NYSCEF Doc. No. 207).
The submission of the attorney for the Child requests the entry of a decision granting Defendant residential custody of A.U., consistent with the Child's desire to primarily reside with Defendant and requests that parental access of Plaintiff with A.U. be limited to daytime only with a goal of A.U. building back Plaintiff's trust while further working on A.U.'s trauma and anxiety.
The submission of Defendant's counsel requests the entry of a decision granting [*7]Defendant sole legal and physical custody of A.U. with parental access of Plaintiff being supervised and/or remedial. Counsel asserts that joint custody of A.U. by the parties is impossible due to the testimony provided at trial. Defendant further avers that Plaintiff's impulse control issues are not in the Child's best interests, that the recommendation of the attorney for the Child should be adopted, and Plaintiff's parental access with the Child should be conditioned on therapy. Counsel further asserts that Plaintiff should be determined to have committed a family offense against A.U. and that a Decision should be entered whereby an Order of Protection would be issued directing that Plaintiff refrain from any corporal punishment of A.U.
The submission of Plaintiff's counsel requests the entry of a decision dismissing Defendant's Family Offense Petition, and granting sole legal and physical custody of A.U. to Plaintiff. Counsel asserts that failure to direct the return of A.U. to Plaintiff's care will result in the Court condoning and perpetuating Defendant's coordinated evisceration of the relationship between A.U. and Plaintiff, pointing to what counsel characterizes as a myriad of egregious violations committed by Defendant. Counsel specifically asserts that Defendant has demonstrated longstanding emotionally abusive behavior towards Plaintiff, as is evidenced by messages sent via Our Family Wizard, multiple unfounded Child Protective Services Complaints, multiple unnecessary requests for police wellness checks, and failure to comply with Plaintiff's parent access schedule.

Hearing Testimony and Documents in Evidence
The Court held a Hearing on March 13, 2024; March 14, 2024; March 15, 2024; and April 9, 2024. At the Hearing Plaintiff was represented by [Redacted], and [Redacted], of [Redacted]. Defendant was represented by [Redacted] of [Redacted]. The parties' Child, A.U., was represented by Court appointed attorney for the Child, [Redacted]. 
Witnesses:
At the Hearing the following witnesses were called to provide testimony:
1. [Redacted]
2. [Redacted]
3. [J.U.], Defendant
4. [Redacted]
5. [L.W.], Plaintiff
Exhibits:
At the Hearing the following Court Exhibits were marked:
1. Court Exhibit 1 — Plaintiff's Witness List.
2. Court Exhibit 2 — Defendant's Witness List.
3. Court Exhibit 3 — Plaintiff's Exhibit List with Stipulation by counsel for all Plaintiff Exhibits to be marked for identification and moved into evidence at Trial.
The following Exhibits were admitted into evidence on consent:
1. Plaintiff's Exhibit 1 — Order of Consolidation, dated August 30, 2023.
2. Plaintiff's Exhibit 2 — Motion Seq. No. 3: Plaintiff's conformed Emergency Order to Show Cause, dated August 29, 2023; together with Affidavit in Support, dated August 28, 2023; Affirmation, dated August 28, 2023; and supporting exhibits.
3. Plaintiff's Exhibit 3 — Motion Seq. No. 3: Attorney for the Child's Affirmation in Partial Opposition to Plaintiff's Order to Show Cause, dated September 8, 2023.
4. Plaintiff's Exhibit 4 — Motion Seq. No. 4: Defendant's Notice of Cross Motion, dated September 11, 2023; and Affidavit in Opposition and Support, dated September 11, 2023.
5. Plaintiff's Exhibit 5 — Motion Seq. Nos. 3 & 4: Plaintiff's Affirmation in Opposition and Reply, dated September 26, 2023.
6. Plaintiff's Exhibit 6 — Motion Seq. Nos. 3 & 4: Decision and Order, dated October 23, 2023.
7. Plaintiff's Exhibit 7 — Our Family Wizard Message Report between the parties, dated September 6, 2020 through November 21, 2023.
8. Plaintiff's Exhibit 8 — The following Town of [Redacted] Police Department Incident Reports: (i) December 17, 2018; (ii) September 5, 2021; (iii) October 12, 2021; (iv) October 14, 2021; (v) November 10, 2021; (vi) November 12, 2021; (vii) March 15, 2022; (viii) May 24, 2022; (ix) June 23, 2022; (x) August 13, 2022; (xi) August 14, 2022; (xii) August 16, 2022; (xiii) August 28, 2022; (xiv) September 6, 2022; (xv) August 2l, 2023; (xvi) August 23, 2023; (xvii) August 24, 2023; and (xviii) October 27, 2023.
9. Plaintiff's Exhibit 9 — The following correspondence to Plaintiff from the New York State Office of Children and Family Services: (i) Case ID: [Redacted], dated November 12, 2021; (ii) Case ID: [Redacted], dated July 11 2022; (iii) Case ID: [Redacted]; dated July 11, 2022.
10. Plaintiff's Exhibit 10 — Photographs taken by Plaintiff of the parties' son (Bates Stamped 0001 - 0049).
11. Plaintiff's Exhibits 11 — 22 - Videos taken by Plaintiff of the parties' son.
12. Plaintiff's Exhibit 23 — [Redacted] Elementary School 2023-2024, [Redacted] Grade Report Card, together with the Progress Report provided by the Special Education Team.
13. Plaintiff's Exhibit 24 — [Redacted] Elementary School Psychological Evaluation (dates of evaluation: November 6th, and 9th, 2020).
14. Plaintiff's Exhibit 25 — [Redacted] Office of Special Services: Initial Speech and Language Evaluation, dated March 8, 2021.
15. Plaintiff's Exhibit 26 — [Redacted] Office of Special Services Annual Review, dated April 14, 2023.
16. Plaintiff's Exhibit 27 — Diagnostic Results re: the parties' Child, dated September 12, 2023.
17. Plaintiff's Exhibit 28 — Correspondence from Child's pediatrician re: necessary for parties' Child to undergo neuropsychological/psychosocial evaluation, dated October 10, 2023.
18. Plaintiff's Exhibits 29 — 30 - Videos taken by Plaintiff of the parties' son.
19. Plaintiff's Exhibit 31 — Our Family Wizard Message Report between the parties, dated November 21, 2023 through March 4, 2024.
20. Plaintiff's Exhibit 32 — [Redacted] School District Documents.
Summary of Witness Testimony of [Redacted]:
[Redacted] testified that she is employed at [Redacted] where she serves as a school-based clinician. She testified that she received a Bachelor's Degree and Master's Degree, both of which are in social work, with her most recent degree earned in 2008. She testified that she is a licensed master's level social worker, working towards obtaining her clinical license, having been employed in the field for approximately sixteen years. She testified that she has worked with children ranging in age from newborn to early twenties. She testified that she does not have any particular training or expertise in custody-based evaluations.
She testified that in her current role she works with youth who are referred by a school [*8]based on the student's needs, which are unrelated to school needs. She testified that the referral process includes a referral form being completed by a counselor from the school, which is received by her employer's intake coordinator who verifies the information received then schedules an intake appointment with [Redacted].
She testified that A.U. was referred to her in the Fall of 2023 and she was advised that A.U. had a lot going on at home which he was having a hard time dealing with. She testified that she met A.U. for the intake on December 4 wherein A.U. was cooperative, attentive, and well-engaged. She testified that she discovered that A.U. had recently experienced a change in his domicile from the mother's home to the father's residence and was having difficulty when he visited his mother. She testified that at her intake session she completed a trauma screening and recalled that A.U. indicated that he had experienced his mother choking him, but as it was difficult for him to discuss she did not pursue it extensively, and she stated that she could be wrong with some of these recollections.
She then testified that she created a safety plan for A.U. either during or shortly after the intake session to utilize when he is feeling overwhelmed, upset, frightened, unsafe, or when he throws things. When asked if A.U. expressed why he would throw things or otherwise behave in that manner, she testified that it was during times when he either felt his mom was not listening to him or was going to make him do something that he did not want to do. However, she noted that her testimony was to the best of her memory, and it could be somewhat inaccurate.
She testified that she has been meeting with A.U. once per week since January 2024. She testified that A.U. is not currently on any psychotropic medication and does not need such medication. When asked what she feels is the primary concern for A.U., she testified that he wants to feel safe about his future by knowing that he is going to be in a safe environment and that he needs to repair his relationship with his mother. She testified that A.U.'s primary fear is that he will not being able to return to see his father after being with his mother. She testified that she is unable to decipher whether or not his fears are well-founded.
She testified that she communicated with Plaintiff twice on the telephone and once in person. She characterized Plaintiff's demeanor as calm and respectful, leaving her with an impression that Plaintiff cares very much for A.U. She testified that she met with Defendant several times for the intake and scheduled sessions, leaving her with an impression of Defendant similar to that of Plaintiff.
She testified that based upon the words and behavior of A.U. it would make sense to her to have A.U. reside primarily with Defendant, while continuing to meet with Plaintiff to facilitate the repair of the relationship between A.U. and Plaintiff. When asked if A.U. provided her with any specifics as to why he was not willing to spend the night at Plaintiff's residence she testified that he had not.
When asked if she has made any recommendations to the parties and A.U. as to how the relationship between A.U. and Plaintiff may be repaired, she testified that she had not as she was focused on identifying coping mechanisms to be used by A.U. to deal with his anxiety when faced with his parenting time with Plaintiff. When asked if either party took responsibility for the fears and anxiety of A.U., she responded that she did not recall.
When later asked about her communications with Plaintiff regarding coping strategies for A.U., she testified that she believed she mentioned this idea but did not know if she could confirm with one hundred percent confidence. When asked if Plaintiff inquired as to how to repair her relationship with A.U., she responded that she did not recall if Plaintiff asked her that [*9]specifically.
She testified that she was presented with an Order of Protection by Defendant causing her not to contact Plaintiff and was unaware that said Order of Protection had been vacated until such time as Plaintiff provided her with further information. She then testified that her lack of communication with Plaintiff was due to instruction by her supervisors. When asked if she was aware that parties had caused CPS investigations against each other and caused several wellness checks where police would be called to each other's homes, she testified that she did not recall.
When asked if she is aware of any physical abuse of A.U. beyond an incident where he was alleged to have been choked by his mother, she testified that she did not recall. When asked about that particular incident she testified that when discussing it in a session A.U. acknowledged that Plaintiff was not choking him but rather was holding him back. She testified that when A.U. told her that Plaintiff had choked him, Defendant was present and A.U. appeared uncomfortable, whereas during a later session when Defendant was not present, A.U. told her that Plaintiff did not choke him. She later testified that Plaintiff's restraint of A.U. was reasonable in that when we are feeling scared and uncertain whether a child is going to do something unsafe, you are going to try to keep them safe. She then testified that trauma is something that is experienced, not necessarily what happened, and therefore, A.U.'s experience during the incident was still traumatic.
She testified that her biggest concern is that A.U. will continue to engage in what she characterized as unsafe behaviors including running away if he continues to feel the need to act like that. She testified that it is possible that A.U.'s behavior is a result of A.U. expressing himself through conduct rather than expressing himself verbally due to his feelings that he is not being listened to or understood during his visits with Plaintiff.
Summary of Witness Testimony of [Redacted]:
She testified that she is employed by the [Redacted] School as a [Redacted]-grade teacher, and she has been employed as a teacher for thirty years. She testified that she has a Master's Degree in Special Education, having received training pertaining to working with students with Dyslexia. She testified that she is familiar with A.U. as he has been her student since September 2023. She testified that he is doing very well and receiving grades in the mid-B range with a modified program, making progress typical of a [Redacted] grader. She testified that he has friends, gets along with the other students, and is involved in extracurricular activities.
She testified that she teaches language arts and social studies. She testified that A.U. is on a modified Individualized Education Program ("IEP") for reading comprehension where he works with a cooperative teacher, occupational therapist and reading professional, which [Redacted] referred to as the team responsible for overseeing the reading curriculum for A.U. She testified that five days per week A.U. participates in a half hour class with the specialized reading professional. While she was aware that A.U. underwent a neuropsychological evaluation, she testified that she did not receive a copy of the evaluation report. She testified that the original IEP of A.U. did not mention a diagnosis of Dyslexia and she could not answer if A.U. receives specialized services to assist him with Dyslexia. She testified that she was unable to answer if the reading professional working with A.U. had specialized training assisting children with Dyslexia.
She testified that as of the last progress report A.U. was currently reading on a Level H text, with ninety-three percent accuracy, placing A.U. at low [Redacted] grade reading level. She [*10]testified that she is familiar with the [Redacted] Reading Program (hereinafter "Program"), which is a specialized phonic-based reading program. When asked if the [Redacted] School District utilizes the Program as part of its teaching methodology, she testified that she was unable to answer that, but that she personally did not adopt the Program as part of her teaching methodology. She testified that A.U. meets with the occupational therapist for thirty minutes in her room and another thirty minutes separately. She testified that she has not observed A.U. with the therapist.
She testified that she has had the opportunity to meet the parties. During parent night, she observed Plaintiff taking photographs of the classroom and placing things inside A.U.'s desk. She testified that she had subsequent communications with Plaintiff during a few special education meetings, wherein Defendant also participated. She testified that Plaintiff did not accept the terms of the school's IEP during A.U.'s intake meeting, after which the school's committee determined the IEP of A.U. would remain. Thereafter, she reported that a reevaluation meeting was held wherein both parties participated to determine if A.U. continued to qualify for services. She testified that Plaintiff requested a copy of all of A.U.'s tests, to which she complied.
Summary of Witness Testimony of [J.U.], Defendant:
He testified that the parties' matrimonial action was commenced in 2018, after which a parenting agreement was entered into by the parties on September 11, 2020. He later testified, "I was driving, and I did not even get to read the document," and continued, "I was literally pulled over on the side of the road when the time came, and I had to put my hand up in the car. So, I didn't read the document until after. So just on the advice of my attorney, I agreed to it." (Tr. at 256:9-10, 14-18).[FN1]

When asked if he was aware of a modification of the agreement entered into by the parties on November 13, 2020, he testified that he did not recall. He testified that he was aware that the parenting agreement provided for A.U. to primarily reside with Plaintiff with Defendant having delineated access time. He testified that at the time the parties entered into the parenting agreement he owned his current residence and was aware that A.U. had a preference to reside with him. He testified that he regretted his decision ever since. When asked if he believed that the parenting agreement was in the best interests of A.U. when he signed it, he responded that he did not believe so, but he voluntarily entered into the agreement, nonetheless.
He testified that he understood the importance of following court orders, and that he respects and follows court orders. However, when asked about a message he sent to Plaintiff on July 2, 2022, which stated, "to think I care about anything with the Court is a joke," he did not deny writing the message and further responded that the message was taken out of context.When asked about a message he sent to Plaintiff on June 2, 2022, he confirmed he wrote, "please don't think for one minute that you or the Court have any relevance." Rather, he responded that when it comes to his son's physical and mental condition, he is charged with protecting him and looks at that as paramount. Moreover, when asked about a message he sent to Plaintiff on July 15, 2022, he confirmed that he wrote, " 
...and not letting him be free and telling him he has to live by a piece of paper and not his own free will is your sick and disgusting [*11]teacher mind indoctrination which will certainly mean you will have a limited or no relationship with him down the road, when he can get free, he counts the days because you suck, not my words, his."
Defendant testified that on December 23, 2023 he sent a message to Plaintiff stating, "I will not be coming down on the weekends anymore, come first of the year, you will have to come and pick him up." When asked if this message indicated that he would no longer comply with the court order requiring him to transport A.U. to and from Plaintiff for his parenting time, he responded that due to his business sale he could no longer make the trip.
When asked if he accepts that he has created a difficult dynamic between A.U. and Plaintiff by way of his pervasive anger and hatred towards Plaintiff, he acknowledged that he did. When asked if he is able to compartmentalize his obvious disdain for Plaintiff and keep it hidden from A.U., he responded in the affirmative. He testified that he does not believe that any of his aggressive exchanges with Plaintiff have an impact on A.U., as the Child has never been a witness to any such exchanges. However, when asked about his communications with Plaintiff, he testified, "I did not want to be part and I will not be part of this show, of this—we have very opposite ways of parenting, that is obvious. I am entitled to my way of parenting my son and she is surely entitled to her way of parenting her son. So, to try and get me to conform and sacrifice my values towards A.U., is not going to happen." (Tr. at 206:18-23).
When asked how many times he had contacted Child Protective Services (hereinafter referred to as "CPS") pertaining to Plaintiff, he responded about four times. He testified that in the three successive years after the parties settled custody of A.U. he made complaints to CPS regarding Plaintiff each year. He confirmed that each of these complaints were determined to be unfounded by the Office of Children and Family Services by letters dated November 12, 2021; July 11, 2022; and September 21, 2023. When asked if it occurred to him that he may be giving A.U. reason to believe that there is something wrong with the way Plaintiff was caring for A.U. due to Defendant's CPS complaints, he testified that it did not. He further testified that Plaintiff made one CPS complaint against Defendant, which was unfounded.
When asked how many times he had contacted the police seeking welfare checks pertaining to Plaintiff, he responded about four times. He confirmed that on September 5, 2021, he requested the [Redacted] Police Department conduct a welfare check, as he did not speak with A.U. on the telephone. He confirmed that on August 16, 2022, he contacted the police because he gave A.U. a cellphone that could not be located. He confirmed that on September 6, 2022, he requested a police welfare check. When asked if it occurred to him that he may be giving A.U. reason to believe that there is something wrong with the way Plaintiff was caring for A.U. due to Defendant's request for police welfare checks, he testified that it did not. He testified that Plaintiff made two requests for police wellness checks on Defendant.
He further testified that on May 23, 2022, he brought A.U. to the [Redacted] Police Department to report a possible sexual offense against Plaintiff pertaining to A.U. He testified that due to this complaint A.U. was subject to interviews by the New York State Police, the Westchester County District Attorneys' Office, and the Westchester County Children's Advocacy Center. He testified that no charges were brought against Plaintiff.
Defendant was then asked about numerous messages sent by him to Plaintiff from September 2021 through March 2024, including the following:
-When asked about a message sent by him on September 28, 2021, "fuck you, if I don't talk to A.U. I will call the troopers and CPS again, your grave is dug, you have dug your [*12]own hole, it will be nice when we get to kick dirt on it and be done with you for good," he confirmed that he recalled the message and testified that Plaintiff had not let him speak to A.U. that night.
-When asked about a message sent by him on December 29, 2021, "You are a disgusting human, if you in any way fuck with my getting away from you and your toxic life, I will walk into the superintendent's office and destroy you, don't you dare fuck with me [L.W.], one game from you and I will be unstoppable in my commitment to destroy you," he confirmed that he sent the message.
 -When asked if he recalled receiving e-mails from Plaintiff asking why A.U. was not in school, to which he responded, "fuck off," he confirmed that he did send the message. He further testified that he wrote to Plaintiff that A.U. should not be with her at all, which is how he felt in December of 2021.
 -When asked about a message sent by him on June 2, 2022, "please don't think for one minute that you or the Court have any relevance," he responded that when it comes to his son's physical and mental condition, he is charged with protecting him and looks at that as paramount.
 -When asked if he recalled communications on June 20, 2022, wherein Plaintiff informed him that it was unacceptable that she had not spoken to A.U. for two days and he responded that, "[L.W.], first of all I gave him the phone and told him earlier to call you when he wanted, so fuck you," he responded that it sounded familiar because it has been a customary response of his.
 -When asked if he recalls receipt of a message from Plaintiff on June 27, 2022, wherein Plaintiff asked that Defendant get A.U. to sleep in his own room and in his own bed, and he responded, "fuck off and stop sending me these bullshit messages, look in the mirror and don't tell me what you want to do in my home and try to create a narrative, was that you trying to engage in some semblance of productive coparenting," he stated that the parties have very different ways of coparenting and that he will not be part of something that he does not believe in.
 -When asked about a message sent by him on July 15, 2022, "once again leave me out of it, you don't have a right to shot if it isn't what he wants," he testified that he did not recall saying that.
 -When asked about a message sent by him on January 21, 2023, "I will not coparent with you, get that straight, I will not be part of this sick thing you call being a parent," he confirmed that he sent the message and did so because he felt excluded from decisions pertaining to A.U.
 -When asked about a message sent by him on July 9, 2023, "A.U. wants more than anything to go before the Judge to straighten you out. You need to answer before he cuts you out of his life completely," he testified that A.U. has said for years that he wants to go before a judge and that he has supported A.U.'s desire to do so. 
 -When asked about a message sent by him on January 10, 2024, "You are really sick," he responded that he declined to comment on it.
 -When asked about a message sent by him on February 24, 2024, "You are an awful person to him, your vanity shows and your arrogance that he is just a child again shows quite frankly how much of an idiot you really are, like I said as soon as he tells me he wants to go I am jumping in the car, good luck with that," he confirmed he wrote the [*13]message. 
 -When asked about a message sent by him on February 29, 2024, "I'm not getting involved. You have no idea how this is traumatizing him and I won't be part of it, so your lying lawyer and you can try to use it against me, no way, this is your problem, you created," he confirmed sending the message.
 -When asked about a message sent by him on March 2, 2024, at 4:06 p.m., "the Judge will see through your lying sack of shit lawyer," he testified that he did not recall the context of the message, so he was unable to provide a clear answer.
When asked about his communications with Plaintiff, he often responded that Plaintiff's counsel was "cherry picking." He nonetheless testified that he is embarrassed at the language he used in these messages and will avoid using such language in the future.
He further testified that Plaintiff failed to communicate with him and involve him in decision-making for A.U. However, he provided the following testimony to the contrary:
-When asked if he received a message from Plaintiff on February 14, 2022, that she was seeking an educational psychological evaluation of A.U., he confirmed that he received the message. He further confirmed that Plaintiff informed him of her intention to meet with an education attorney regarding A.U. in February of 2022 and that he was invited to attend. He testified that he did not attend the meeting but did not recall any response he made to Plaintiff.
-When asked if he received a message from Plaintiff on March 7, 2022, wherein Plaintiff communicated what sports activities were available for A.U. and asking for his assistance in speaking with A.U. to determine what sports he would like to be enrolled in, he testified that he did not recall the communication. He did however testify that he recalled receipt of another message from Plaintiff on March 17, 2022, indicating that as she had not received a response from him, she asked that he respond or enroll A.U. He then testified that he responded to Plaintiff indicating that A.U. wanted to participate in flag football but only if Defendant took A.U.
 -When asked if he was in regular communication with the prior therapist of A.U., he confirmed that he was.
 -He further testified that he was aware Plaintiff had engaged the Kumon process for A.U. and had asked that Defendant participate and had informed him that she was doing one math workbook and one reading workbook at a time. He testified that he wrote a message to Plaintiff on March 8, 2022, wherein he declined to participate in the Kumon process. 
 -When asked about communication with Plaintiff on May of 2022 pertaining to whether or not Defendant had any communication regarding to A.U.'s medical care for a rash, he testified that he was informed and that he further recalls that Plaintiff advised him that she will wait to see what the medical provider says before returning A.U. to school. When asked why he filed a family offense petition in August of 2023, he testified that an altercation occurred in the afternoon on August 21, 2023. He testified that he dropped A.U. off at Plaintiff's home that morning, went back to work, saw a missed call from A.U., and when he returned the call, A.U. was hysterically crying. He later testified that he dropped A.U. off at Plaintiff's home at noon and then received a call from A.U. at 1:00 p.m. He testified that he told A.U. to run up to the end of the road and that he would pick A.U. up.
He testified that following the call with A.U. he called the [Redacted] Police Department [*14]and asked them to meet Defendant at Plaintiff's residence. He testified that when he arrived to pick up A.U. the Child was standing at a street corner, Plaintiff was in her car on the adjacent corner and the Child ran to Defendant's vehicle, at which time Plaintiff chased A.U. to the door of Defendant's vehicle. He testified that as A.U. was next to the vehicle, and Plaintiff grabbed the Child But when asked how she grabbed him, Defendant responded that he could not see. He testified that he later learned of the contact after watching a video taken by Plaintiff and that at the time of the contact, A.U. started crying. Defendant testified that he became hysterical himself, yelled at Plaintiff and attempted to get A.U. away from Plaintiff. He testified that at this time he saw Plaintiff pressing on A.U.'s neck with her arm around his neck, and that A.U.'s face was beet red. He testified that Plaintiff let go and A.U. entered the door to Defendant's vehicle and closed the door.
He testified that the police responded to the scene, spoke to Defendant and Plaintiff, and that after he told the police he was not going to let his son go, the police allowed him to leave. He testified that he reported to the responding police officer that since 2019 Plaintiff had been emotionally and physically abusing A.U. He testified that he was not going to put A.U. back into a dangerous situation and that after leaving the scene he went to Family Court at which time he was issued a temporary order of custody, and temporary order of protection. He testified that he never returned to Family Court, as he was summoned to appear in the instant action.
Defendant testified that the aforementioned incident was the only physical contact he believed to have occurred between Plaintiff and A.U. When asked what physical contact he saw when arriving at Plaintiff's home, he testified that he saw Plaintiff's arms around A.U.'s neck. He testified that he included hitting in his family offense petition, despite the fact that he did not witness any hitting. He then later testified that as A.U. was getting in the car Plaintiff's arm came over A.U. and A.U. was hit when Plaintiff's arm went around him.
He testified that A.U. began school on September 5th or 6th, at which time Defendant provided the requested paperwork to the school, including the orders entered by the Family Court. Defendant testified that A.U. has been residing with him since that time, and he has attended school faithfully. He testified that A.U. has made friends and is active in a number of extracurricular activities. He testified that since September, A.U. has slept over at Plaintiff's home seven or eight times, each of which has caused A.U. to be uncooperative as he does not want to go. He testified that he attempts to calm the Child down and talk to Plaintiff. He testified that A.U. does not feel safe and has issues with Plaintiff asking A.U. to sleep with her.
When asked what he would like the outcome of this case to be, he testified that he would like A.U. to have a relationship with Plaintiff, that A.U. is loved by both parents, and that A.U. feels heard by both parents. When asked if A.U. is in a position to determine if and when he will have a relationship with Plaintiff, he testified in the affirmative as he believes A.U. is knowledgeable enough to make said determination. He testified that he would like physical custody of A.U. with a program where A.U. and Plaintiff can rebuild their relationship. He testified that Plaintiff is a good, caring, and capable mother and loves A.U.
Summary of Testimony of [Redacted]:
She testified that she is in her final year attending [Redacted]. She testified that she is Plaintiff's niece and the cousin of A.U., with an eleven-year age difference between the two individuals. She testified that she loves A.U. and Plaintiff, but when asked if she would do anything for Plaintiff responded that she would if it was legal, ethical, and moral.
She testified that she has been involved in A.U.'s life since birth and that it has always [*15]been important for her to visit with A.U., as she is probably the closest cousin with A.U., with respect to both age and time commitment. She testified that over the last five years she has spent every major holiday with A.U., as well as time in the Spring and Summer, and that A.U. has visited her at [Redacted]. She testified that she plays games with A.U. and reads to him before bedtime.
She testified that in October 2023, she visited with A.U. at Plaintiff's home. During that visit she noted that they watched television together, cooked breakfast together, and there was no distinct negative emotion that day. She testified that the interactions between A.U. and his mother have always been good. She testified that she could not identify any instance in which A.U. communicated negative feelings to her about Plaintiff and could not recall any instance when A.U. exhibited any feelings of fear towards Plaintiff. She testified that she has seen a loving relationship between Plaintiff and A.U., and when she comes to visit Plaintiff always wants to be a good mother and has activities planned for A.U. and Plaintiff.
She testified that she has been present when A.U. has had a melt-down, which she attributed to being overtired or something fun ending. She testified that she could not recall A.U. becoming physical except for pushing Plaintiff away if she wanted to put a coat on him or something similar. She testified that when A.U. experiences these moments, Plaintiff speaks to A.U. in a calm demeanor and attempts to sooth him and gives him some space.
She testified that she wants what is best for A.U. When asked if she believes that A.U. stated he wanted to reside with Defendant, she testified that if A.U. said that then that is what he said. She testified that A.U. may not have the ability to think about what is best for him long term in life due to his young age. She testified that she has a similar story as her parents divorced when she was a similar age, she is just beginning to understand it now and she did not have the emotional capacity or knowledge to be able to make accurate life decisions at that young age.
Summary of Witness Testimony of [L.W.], Plaintiff:
She testified that she has been employed as a schoolteacher for the past thirty years. 
She testified that the parties entered into a parenting agreement wherein Defendant had approximately five out of fourteen nights on a standard two-week rotation. When asked if she recalled Defendant testifying that he had not read the parenting agreement, she responded that she almost had to keep herself from laughing as Defendant was involved in the negotiation of that agreement. She testified that other than the five nights out of every two weeks when the Child was with Defendant, she was with A.U. She testified since the matrimonial action was commenced A.U. has not missed any parenting time with Defendant. She testified that in his prior school, A.U. was popular and was not bullied. She testified that A.U. took part in a number of extracurricular activities, which she supported.
She testified that Defendant has disrupted her parenting time with A.U., including testimony of specific examples in 2022 and 2023:
-She testified that on Mother's Day of 2023, in violation of the parenting agreement, Defendant advised her that he had special plans for only him and A.U. She testified that Defendant did return A.U. late, causing her and the Child to travel to her mother's house later than planned, that A.U. was crying, and it was a disaster.
-She then testified about a period between August 28 and September 1, 2022, indicating that A.U. was not returned to her by Defendant. She testified that she sought police assistance and when she arrived at Defendant's home with a police officer, the Defendant told the officer to get the fuck off his property and that A.U. was not going anywhere. [*16]She testified that the event was traumatic for A.U. who came out of Defendant's home at one point crying. She testified that she returned a second time with a Court Order. She testified that soon after A.U. was returned to her she overheard A.U. on the phone with Defendant who told him not to go to school, to lock himself in his room and to call 911. She testified that A.U. later called 911 and when she asked the Child why he called 911 he told him that Defendant told him to.
 -She then testified that on September 27, 2022, she received an e-mail from Defendant indicating that he was celebrating Rosh Hashanah. She testified that A.U. has not been exposed to any religious training, neither party identifies as Jewish, Defendant has never celebrated any Jewish holidays prior to this date, and the parenting agreement did not reference any Jewish holidays.
 -She testified that she informed Defendant of her plans for Thanksgiving of 2022 to travel with A.U. to her sister's home in [Redacted], which resulted in Defendant telling her that he never provided his consent and would be calling the police to prevent them from traveling to [Redacted]. She testified that A.U. was aware of this situation and upset that the police were going to be involved.
 -She then testified about Christmas break of 2022 reporting that Defendant continued his behavior of not following the parenting agreement by failing to return A.U. on time. She testified that Defendant held A.U. during her entire parental access time.
 -When asked about A.U.'s birthday in 2023, she testified that she did not see A.U. She testified that the parenting agreement provides that the parent who is not with A.U. during that day can have a few hours with him.
When asked to describe her co-parenting of A.U. with Defendant during the period of September 2020 to August 21, 2023, she responded that it was verbally abusive, emotionally abusive, toxic, and unwilling. When asked if she recalled the testimony of Defendant regarding certain communications with Plaintiff resulting from his frustration, she testified that she believes he felt frustration due to the fact that he did not get what he wants. She noted that Defendant's testimony that he did not communicate with Plaintiff in a negative, curse-filled manner in the presence of A.U. was false and that Defendant almost exclusively communicated with her in that manner in front of the Child. She testified that A.U. has adopted the use of such language when he seems to be under the impression that he is not getting his way.
She testified about one instance in the Summer of 2023 when A.U. was at his maternal grandparent's house having dinner and Defendant kept the Child on the phone for a long period of time. She recalled overhearing Defendant tell A.U. to tell Plaintiff to go away and get lost, after which time A.U. repeated those statements to her. She testified that she then recalls Defendant providing words of reassurance to A.U. for having used that language with Plaintiff. She testified that she had never heard A.U. speak like that, and afterwards she went to her car to call her sister and cry, and stated, "It was like this is how you create an abuser." (Tr. at 317:6).
When asked about a communication by Defendant to Plaintiff dated July 2, 2022, Plaintiff read the message, "Once again, leave me out of it. You don't have a right to shit if it isn't what he wants and not his own free will is your sick and disgusting teacher-mind indoctrination which will certainly mean you will have a limited or no relationship with him down the road when he can get free. He counts the days because you suck. Not my words, his." She testified that this is Defendant's constant position and that she interpreted Defendant's message to refer to A.U., whom she noted was [Redacted] years old at the time of the message. [*17]When asked about the difference between the parties' parenting approach, she responded that when she when the Child wants something, she decides whether or not it is in the best interest of A.U. She further testified that Defendant's parenting style allows A.U. to determine what he will or will not do, which has been very challenging and A.U. insists that this is in the parenting agreement that Defendant has read to him. She testified that this is difficult because a [Redacted]-year-old cannot determine what he wants all the time and he has a significant learning disability and social issues, which are explained in the neuro psych of A.U.
She testified that over the past two to three years when she has attempted to implement medical and educational decisions with A.U. there have been situations where the Child is initially compliant but after A.U. speaks to Defendant, he refuses to go along with the plan. She testified that on one occasion A.U. was returned to her by Defendant with a rash, for which she had to obtain an antibiotic prescription from the Child's pediatrician. Plaintiff administered the first dose of antibiotics to A.U. but after the first dose, Defendant advised Plaintiff that the Child dumped the medication down the sink and informed Plaintiff that Defendant knows the most famous doctors in the world, and they said antibiotics are not good for you.
She testified that on or about November 14, 2022, A.U. was kept home from school when he was with Defendant and when Plaintiff asked how A.U. was feeling, Defendant responded by telling her, "He is sick you fucking idiot." She recalled that when she further inquired as to whether or not A.U. needed medical intervention, she never found out why he was kept home from school.
She testified when A.U. was finishing [Redacted] grade the school district recommended that A.U. attend summer school as he was at risk of regressing and A.U. would have attended summer school for a couple of hours each day, leaving time for additional activities. She testified that she was supportive of A.U. attending summer school as his reading was very slow, but Defendant was not supportive.
She testified that CPS had contacted her in 2022 and 2023 regarding allegations that she had sexually abused A.U., including a statement that Plaintiff had touched A.U.'s private parts. When asked where this could have come from, she responded that A.U. suffers from eczema and as a result of bathing, and he can get a fungus infection which requires cream to be applied to the groin area. She testified that the CPS complaints were unfounded.
She testified that in the days prior to August 21, 2023, A.U. was with Defendant pursuant to the summer access schedule set forth in the parenting agreement. She testified that A.U. was scheduled to return to Plaintiff on August 20, 2023 but did not. Plaintiff testified that she contacted Defendant, who did not provide a straight answer as to when he would return the Child. She testified that Defendant ultimately returned the Child the next day. She testified that on August 21, 2023, A.U. kept asking her to tell him when it was 1:00 p.m. and at that time, A.U. called Defendant. Plaintiff then overheard the Child tell Defendant he was ready to do the plan. She testified that the Child then told her he was going to leave for a walk, which he had never done before. She testified that there was no physical altercation between her and A.U., but that she followed the Child outside. She testified that there was an approximate thirty-minute period between when A.U. was returned home by Defendant and when he first left her home. At that point she testified that A.U. began to cry and told Plaintiff to go back inside the house.
She testified that she and the Child returned to her home, and she heard A.U. call Defendant for a second time and say, "something along the lines of I can't do this today, I feel like I'm having a heart attack." (Tr. at 302:13-14). She testified that there was no hitting that [*18]occurred between her and A.U. in the house. After this call she testified that A.U. again stated he was going for a walk. She testified that there was an approximate fifteen-minute period when A.U. was at the house between the first and second walk.
She testified that she followed him in her car when he went for his walk. She testified that he walked to the corner, was on his cellular phone, began pacing and looking in the direction from where cars would come. She testified that Defendant appeared, at which time Plaintiff turned on the video camera on her cellphone and Defendant directed A.U. to get in his car. She testified that she tried to block the car door, she heard the police on the Bluetooth, and A.U. was crying. She testified that when Defendant saw she was filming, he began to yell that she was choking A.U., but that her arm was just extended, and she was not choking her Child at all. She testified that she does not recall restraining A.U. and that she believes that Defendant created a scheme and enlisted A.U. to carry it out.
She testified that any feelings of A.U. being fearful or unhappy have been created by Defendant, due to his constant involvement of police officers and CPS, which causes A.U. to believe that something is wrong. She testified that A.U. is lost and isolated from a large loving family. A.U. needs both parents in his life, and she would like to see A.U. as much as possible. She testified that A.U. has seen a therapist, [Redacted], for two years who would be able to assist with a transition. She testified that she believes A.U. should finish school where he is currently residing with Defendant and attend Winward next year.

 Findings of Fact & Conclusions of Law
a. Witness Credibility
As custody determinations depend in large part on the court's assessments of the credibility, character, temperament, and sincerity of the parties, the trial court's determination should be accorded deference, and its determination should not be disturbed unless it lacks a sound and substantial basis in the record (Sanchez v. Rexhepi, 30 N.Y.S.3d 170 [2d Dept 2016]). "In matters of this character 'the findings of the nisi prius court must be accorded the greatest respect'" (Eschbach v. Eschbach, 56 NY2d 167 [1982], quoting, Matter of Irene O., 381 N.Y.S.2d 865 [1975]).
"The memory, motive, mental capacity, accuracy of observation and statement, truthfulness and other tests of the reliability of witnesses can be passed upon with greater safety by a trial judge who sees and hears the witnesses than by appellate judges who simply read the printed record" (Barnet v. Cannizzaro, 3 AD2d 745 [2d Dept 1957]).
"Where a witness has given testimony that is demonstrably false, we may, in accordance with the maxim falsus in uno falsus in omnibus, choose to discredit or disbelieve other testimony given by that witness (DiPalma v. State of New York, 90 AD3d 1659 [4th Dept 2011]). Where a witness has provided testimony before a Court which contains material facts which conflict with material facts set forth by that witness in a sworn affidavit, even if such compromised testimony did not result in bad faith, that witness may not be deemed credible (Medina v. Essex Estates, 72 Misc 3d 1225(A) [Civ. Ct. New York City 2021]).
Based upon the demeanor and substance of the testimony of Defendant, the Court finds that Defendant is not a credible witness and while this Court does not entirely discredit his testimony, it has afforded his testimony little weight. The Court made this determination based upon an assessment of the Defendant's character, temperament, and sincerity. Notably, while Defendant's testimony at trial included a statement that he had not read the Parenting Agreement, this is refuted by Defendant's sworn statements within the Parenting Agreement, Stipulation of [*19]Settlement, and Stipulation of Settlement Affidavits, wherein he confirmed that he had done so. As this testimony of Defendant has been determined to be demonstrably false the Court has determined it appropriate to invoke the doctrine of maxim falsus in uno falsus in omnibus, finding it appropriate to discredit or disbelieve other testimony given by Defendant. Defendant's testimony further confirms that although Defendant filed the Family Offense Petition asserting serious allegations against Plaintiff, these allegations were false, as he acknowledged that he did not witness Plaintiff hitting A.U. or threatening A.U. with a dangerous instrument. Nonetheless, Defendant filed the Petition in order to secure his unmistakable objective of obtaining a temporary order of custody of A.U. and temporary order of protection against Plaintiff pertaining to A.U.
With respect to the remaining witnesses, [Redacted], [Redacted], [Redacted], and [L.W.], the Court found each to be credible based upon the demeanor and substance of their testimony. The Court made this determination based upon an assessment of each witness's character, temperament, and sincerity.
b. Defendant's Family Offense Petition & Request for Order of Protection
"It is well established that the party seeking an order of protection has the burden of establishing by a preponderance of the evidence that the party for which the order is seeking to restrain has committed the alleged family offense, and whether a family offense has been committed is a factual issue to be resolved by the court, and its determinations regarding the credibility of witnesses are entitled to great weight" (Susan WW. On Behalf of Karri-Ann WW. v. Alan WW., 161 AD3d 1249, 1250 [3d Dept 2018]; Richardson v. Richardson, 80 AD3d 32 [2d Dept 2010]; see also Family Court Act § 812).
Here, Defendant alleged that Plaintiff committed the following family offenses against him or A.U.: (1) disorderly conduct; (2) harassment in the first or second degree; (3) assault in the second degree; (4) strangulation; (5) menacing in the second or third degree. Each will be addressed in turn below.
Pertaining to disorderly conduct, under the New York State Penal Law (hereinafter "Penal Law") § 240.20:
"A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof:
1. He engages in fighting or in violent, tumultuous or threatening behavior; or
2. He makes unreasonable noise; or
3. In a public place, he uses abusive or obscene language, or makes an obscene gesture; or
4. Without lawful authority, he disturbs any lawful assembly or meeting of persons; or
5. He obstructs vehicular or pedestrian traffic; or
6. He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse; or
7. He creates a hazardous or physically offensive condition by any act which serves no legitimate purpose."
Discussing review of a family offense petition wherein disorderly conduct was alleged, the Second Department has noted:
"As the Court of Appeals has emphasized, in the context of a criminal case, 'critical to a charge of disorderly conduct is a finding that [the] disruptive statements and behavior were of a public rather than an individual dimension' (People v. Baker, 20 NY3d 354, [*20]359; see People v. Munafo, 50 NY2d 326, 331). In that respect, 'a person may be guilty of disorderly conduct only when the situation extends beyond the exchange between the individual disputants to a point where it becomes 'a potential or immediate public problem'' (People v. Weaver, 16 NY3d 123, 128, quoting People v. Munafo, 50 NY2d at 331). 'In assessing whether an act carries public ramifications, relevant factors to consider are the time and place of the episode under scrutiny; the nature and character of the conduct; the number of other people in the vicinity; whether they are drawn to the disturbance and, if so, the nature and number of those attracted; and any other relevant circumstances' (People v. Weaver, 16 NY3d at 128; see People v. Baker, 20 NY3d 354). The complicating factor in the present case, which is a family offense proceeding rather than a criminal action, is that Family Court Act § 812 provides: 'For purposes of this article, 'disorderly conduct' includes disorderly conduct not in a public place' (Family Ct. Act § 812[1]). (Cassie v. Cassie, 109 AD3d 337 [2d Dept 2013])."
Based upon the testimony and evidence received by the Court at trial, it is the determination of this Court that Defendant has failed to provide a basis for the Court to determine Plaintiff has engaged in the family offense of disorderly conduct.
Pertaining to harassment in the first degree, under Penal Law § 240.25:
"A person is guilty of harassment in the first degree when he or she intentionally and repeatedly harasses another person by following such person in or about a public place or places or by engaging in a course of conduct or by repeatedly committing acts which places such person in reasonable fear of physical injury. This section shall not apply to activities regulated by the national labor relations act, as amended, the railway labor act, as amended, or the federal employment labor management act, as amended."
Based upon the testimony and evidence received by the Court at trial, it is the determination of this Court that Defendant has failed to provide a basis for the Court to determine Plaintiff has engaged in the family offense of harassment in the first degree.
Pertaining to harassment in the second degree, under Penal Law § 240.26:
"A person is guilty of harassment in the second degree when, with intent to harass, annoy or alarm another person:
1. He or she strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same; or
2. He or she follows a person in or about a public place or places; or
3. He or she engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose."
The Courts have held that intent required for a finding of family offense of harassment in the second degree may be inferred from surrounding circumstances and even a single incident is legally sufficient to support a finding that respondent committed a family offense (Richardson v. Brown, 173 AD3d 875 [2d Dept 2019]).
Based upon the testimony and evidence received by the Court at trial, it is the determination of this Court that Defendant has failed to provide a basis for the Court to determine Plaintiff has engaged in the family offense of harassment in the second degree.
Pertaining to menacing in the second degree, under Penal Law § 240.25:
A person is guilty of menacing in the second degree when:
"1. He or she intentionally places or attempts to place another person in reasonable fear of physical injury, serious physical injury or death by displaying a deadly weapon, [*21]dangerous instrument or what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; or
2. He or she repeatedly follows a person or engages in a course of conduct or repeatedly commits acts over a period of time intentionally placing or attempting to place another person in reasonable fear of physical injury, serious physical injury or death; or
3. He or she commits the crime of menacing in the third degree in violation of that part of a duly served order of protection, or such order which the defendant has actual knowledge of because he or she was present in court when such order was issued, pursuant to article eight of the family court act, section 530.12 of the criminal procedure law, or an order of protection issued by a court of competent jurisdiction in another state, territorial or tribal jurisdiction, which directed the respondent or defendant to stay away from the person or persons on whose behalf the order was issued."
Based upon the testimony and evidence received by the Court at trial, it is the determination of this Court that Defendant has failed to provide a basis for the Court to determine Plaintiff has engaged in the family offense of menacing in the second degree.
Pertaining to menacing in the third degree, under Penal Law § 240.25:
"A person is guilty of menacing in the third degree when, by physical menace, he or she intentionally places or attempts to place another person in fear of death, imminent serious physical injury or physical injury."
Based upon the testimony and evidence received by the Court at trial, it is the determination of this Court that Defendant has failed to provide a basis for the Court to determine Plaintiff has engaged in the family offense of menacing in the third degree.
Pertaining to strangulation in the second degree, under Penal Law § 121.12:
"A person is guilty of strangulation in the second degree when he or she commits the crime of criminal obstruction of breathing or blood circulation, as defined in section 121.11 of this article, and thereby causes stupor, loss of consciousness for any period of time, or any other physical injury or impairment."
Based upon the testimony and evidence received by the Court at trial, it is the determination of this Court that Defendant has failed to provide a basis for the Court to determine Plaintiff has engaged in the family offense of strangulation in the second degree.
Pertaining to strangulation in the first degree, under Penal Law § 121.13:
"A person is guilty of strangulation in the first degree when he or she commits the crime of criminal obstruction of breathing or blood circulation, as defined in section 121.11 of this article, and thereby causes serious physical injury to such other person."
Based upon the testimony and evidence received by the Court at trial, it is the determination of this Court that Defendant has failed to provide a basis for the Court to determine Plaintiff has engaged in the family offense of strangulation in the first degree.
Accordingly, based upon the testimony and evidence received by the Court at trial, the Family Offense Petition of Defendant is hereby dismissed entirely, and any orders of protection entered against Plaintiff pertaining to Defendant and A.U. are vacated, including but not limited to NYSCEF Doc. No. 147.
c. Plaintiff's Request for an Order of Protection Against Defendant Benefiting Plaintiff & A.U.
A party may establish by fair preponderance of evidence that another's actions constitute a family offense of harassment in second degree by sending threatening text messages and [*22]repeatedly calling police to conduct wellness checks on the individual, despite knowledge such checks were unnecessary, served no legitimate purpose, and established course of conduct was undertaken with intent of seriously annoying or alarming the party, and the individual's intent to commit the offense was fairly inferable from surrounding circumstances (Inez A. v. David A., 222 AD3d 547 [1st Dept 2023]).
The Second Department has held that the inclusion of minor children as protected persons in an order of protection benefiting one parent against another is appropriate when the evidence demonstrated that doing so was necessary to further the purposes of protection, such as the close proximity of the minor children to the protected spouse during the incidents which gave rise to the entry of the subject order of protection (Cook v. Berehowsky, 211 AD3d 727 [2d Dept 2022]).
Based upon the submissions made to this Court and the evidence received at trial the Court determines that Plaintiff has proven by a fair preponderance of the evidence that Defendant's actions, in sending Plaintiff inappropriate and abusive Our Family Wizard messages, constitute a family offense of harassment in the second degree against Plaintiff, as this Court has determined that the multiple messages established a course of conduct undertaken by Defendant with the intent of seriously annoying or alarming Plaintiff, and the Defendant's intent to commit the offense was fairly inferable from surrounding circumstances.
Therefore, this Court shall enter an Order of Protection for the benefit of Plaintiff against Defendant, restraining Defendant for a period of five years which shall terminate on July 9, 2029, in the following manner:
1. [J.U.] (D.O.B.: [Redacted]) shall observe the following conditions:
a. Stay away from [L.W.] (D.O.B.: [Redacted]), except to effectuate parental access time as set forth herein or in future Decisions and Orders of this Court;
b. Stay away from the home of [L.W.] (D.O.B.: [Redacted]);
c. Stay away from the business of [L.W.] (D.O.B.: [Redacted]);
d. Stay away from the place of employment of [L.W.] (D.O.B.: [Redacted]);
e. Refrain from communication or any other contact by mail, telephone, e-mail, voicemail, social media or other electronic or any other means, with [L.W.] (D.O.B.: [Redacted]), except for Our Family Wizard messages regarding the parties' minor Child A.U. (D.O.B.: [Redacted]); and
f. Refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, strangulation, criminal obstruction of breathing or circulation, disorderly conduct, criminal mischief, sexual abuse, sexual misconduct, forcible touching, intimidation, threats, identity theft, grand larceny, coercion, unlawful dissemination or publication of intimate image(s) or any criminal offense against [L.W.] (D.O.B.: [Redacted]).
g. Surrender any and all handguns, pistols, revolvers, rifles, shotguns and other firearms owned or possessed; and do not obtain any further guns or firearms. Such surrender shall take place immediately, but in no event later than July 12, 2024: at [Redacted]; and it is further ordered that the above-named license to carry, possess, repair, sell or otherwise dispose of a firearm or firearms pursuant to Penal Law § 400.00 is suspended; and the above-named shall remain ineligible to receive a firearm license while this Order is in effect (with a copy of this Order of Protection to be served upon [Redacted]).
The Court further finds it appropriate to enter a second Order of Protection for the benefit [*23]of A.U. against Defendant, restraining Defendant for a period of five years which shall terminate on July 9, 2029, in the following manner:
1. [J.U.] (D.O.B.: [Redacted]) shall observe the following conditions:
a. Refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, strangulation, criminal obstruction of breathing or circulation, disorderly conduct, criminal mischief, sexual abuse, sexual misconduct, forcible touching, intimidation, threats, identity theft, grand larceny, coercion, unlawful dissemination or publication of intimate image(s) or any criminal offense against A.U. (D.O.B.: [Redacted]).
d. Plaintiff's Request for Determination that Defendant is in Breach of Judgment, Parenting Agreement and Stipulation of Settlement
In a decision by the Second Department wherein one party asserted a breach of contract claim against a former spouse alleging failure to comply with provisions in a judgment of divorce, the Court noted:
"The essential elements of a cause of action to recover damages for breach of contract are 'the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of its contractual obligations, and damages resulting from the breach" (Cruz v. Cruz, 213 AD3d 805 [2d Dept 2023], quoting, Klein v. Signature Bank, 204 AD3d 892 [2d Dept 2022]).
In this matter, it is without question that the parties entered into the Parenting Agreement and Stipulation of Settlement, each of which constituted contracts between the parties, the terms of which were incorporated by reference but not merged into the parties' Judgment. At trial the Court received evidence and testimony that led the Court to conclude that Plaintiff had dutifully complied with the terms of the Parenting Agreement, and Stipulation of Settlement, while Defendant breached the contractual obligations of the Parenting Agreement and Stipulation of Settlement, resulting in damages to Plaintiff.
Specifically, the Court determines that on numerous occasions Defendant failed to comply with the contractual obligations set forth in the Parenting Agreement, and Stipulation of Settlement pertaining to the parental access schedule of the parties for their minor Child. These violations include failure to return the Child from both routine access and holiday access as reflected in the testimony of Plaintiff, resulting in Plaintiff suffering damages, namely the loss of parenting time.
Accordingly, the Court determines that the Defendant is in breach of the parties' Judgment of Divorce, dated January 8, 2021, which incorporated, but did not merge, the Parenting Agreement, dated September 11, 2020, and Stipulation of Settlement, dated November 13, 2020, for his willful failure and refusal to abide by the access schedule set forth therein.
e. Request for Modification of Child Custody & Access
"Modification of a court-approved stipulation setting forth the terms of custody or parental access is permissible only upon a showing that there has been a sufficient change in circumstances such that modification is necessary to ensure the best interests and welfare of the child (Baraz v. Polyakov, 198 AD3d 853 [2d Dept 2021]; see also, Sukul v. Sukul, 196 AD3d 661 [2d Dept 2021]). "The paramount concern when making such a determination is the best interests of the child under the totality of the circumstances" (Burke v. Squires, 162 N.Y.S.3d 434 [2d Dept 2022]).
"Priority in custody disputes should usually be given to the parent who was first awarded [*24]custody by the court or to the parent who obtained custody by voluntary agreement" (White v. Mazzella—White, 84 AD3d 1068 [2d Dept 2011]). "Where possible, custody should be established on a long-term basis, 'at least so long as the custodial parent has not been shown to be unfit, or perhaps less fit, to continue as the proper custodian'" (Jackson v. Jackson, 31 AD3d 386 [2d Dept 2006], quoting, Obey v. Degling, 37 NY2d 768 [1975]).
"Factors to be considered include the relative fitness of the parents, the quality of the home environment, the parents' financial status, the parental guidance given to the child, the ability of each parent to provide for the child's emotional and intellectual development, and the effect an award of custody to one parent might have on the child's relationship with the other parent" (Hogan v. Hogan, 71 N.Y.S.3d 601 [2d Dept 2018]). "Furthermore, in determining custody, while the express wishes of children are not controlling, they are entitled to great weight, especially where their age and maturity would make their input particularly meaningful" (Canella v. Anthony, 4 N.Y.S.3d 533 [2d Dept 2015]). "Entrusting the custody of young children to their parents jointly, especially where the shared responsibility and control includes alternating physical custody, is insupportable when parents are severely antagonistic and embattled" (Braiman v. Braiman, 407 N.Y.S.2d 449 [1978]).
"Moreover, pursuant to Domestic Relations Law § 240(1)(a), in any action or proceeding concerning custody or parental access where domestic violence is alleged, the court must consider the effect of such domestic violence upon the best interests of the child along with all the other relevant factors when the allegations of domestic violence are proven by a preponderance of the evidence" (Scott v. Thompson, 166 AD3d 627 [2d Dept 2018]).
Repeated and unfounded allegations of neglect or abuse by one parent against the other have been held to constitute an act of interference with the parent-child relationship so inconsistent with the best interests of the children as to raise a strong probability that the mother is unfit to act as custodial parent (Abramson v. Shaw, 154 AD3d 744 [2d Dept 2017]; see also, Tyrone v. Lucretia S., 4 AD3d 205 [1st Dept 2004]).
It is well established that a natural parent has a claim of custody of his or her child, superior to that of all others, unless the parent has abandoned that right or is proved unfit to assume the duties and privileges of parenthood (Katherine D. v. Christine D., 589 N.Y.S.2d 1002 [2d Dept 1992]).
"A noncustodial parent is entitled to meaningful visitation, and [d]enial of that right is so drastic that it must be based on substantial evidence that visitation would be detrimental to the welfare of the child" (Izquierdo v. Santiago, 54 N.Y.S.3d 704 [2d Dept 2017] [internal quotation marks omitted]).
A determination that supervised therapeutic visitation is in the best interests of a minor child by a trial Court will not be disturbed if it has a sound and substantial basis in the record (Thompson v. Thompson, 41 AD3d 487 [2d Dept 2007]. A Trial Court may include within a decision that the passage of a certain duration of therapeutic visitation completed by a parent may be deemed a change in circumstances permitting the parent or the attorney for the child to request a modification of the order (Kantrowitz ex rel. Cummo v. Cummo, 67 AD3d 680 [2d Dept 2009]).
This Court finds that due to the parties' severely antagonistic and embattled history, the continued joint legal custody of the Child by the parties is not possible and therefore the Court is compelled to award sole legal custody of A.U. to the Plaintiff. The Court is further compelled to award sole physical custody of A.U. to Plaintiff, subject to an access schedule of Defendant as [*25]set forth herein. The Court initially recognizes that with respect to a determination as to physical custody priority should be afforded to Plaintiff as the parties agreed Plaintiff was to have physical custody of A.U. in both the Parenting Agreement and Stipulation of Settlement. The Court finds that this priority should remain in effect as Plaintiff has not been determined by this Court to be unfit, or less fit, to continue as the primary custodial parent. To the contrary, for reasons set forth herein, this Court finds that even absent such priority, Plaintiff is without question the more appropriate physical custodian of A.U. as this Court finds Defendant's pattern of abusive conduct to constitute significant adverse interference with Plaintiff's relationship with A.U. that has been persistent and insidious. 
As noted above, this Court has determined Defendant has engaged in domestic violence against Plaintiff and thus, awarded Plaintiff an Order of Protection to prevent Defendant's continued misconduct. This Court has further entered an Order of Protection for the benefit of A.U. against Defendant to further fulfill the desired protection. When considering this existence of domestic violence by Defendant with respect to a custody determination of A.U., the Court found it highly troubling that when questioned about his inappropriate messages to Plaintiff, Defendant acknowledges sending them but demonstrated no meaningful remorse and seemingly chastised Plaintiff's counsel for what he described as "cherry picking." The aforementioned messages were sent through the Our Family Wizard application, which is intended to serve as a mode of communication between parties involved in high conflict custody matters to avoid such inappropriate communication, as the parties are made aware by counsel and the Court that such communications are recorded so that they may be used in future Court intervention. Defendant was aware that said messages were sent through Our Family Wizard, leading the Court to conclude that Defendant is recalcitrant in his behavior, and he proceeds with no regard for possible future consequences of his conduct. 
Similarly, the Court was presented with unrefuted evidence of multiple unfounded Child Protective Services complaints against Plaintiff by Defendant, and multiple requests for law enforcement wellness checks of A.U. during Plaintiff's parenting time which resulted in no finding of harm to A.U. While the Court acknowledges that these complaints alone constitute an act of interference with the parent-child relationship so inconsistent with the best interests of the children as to raise a strong probability that the father is unfit to act as custodial parent, the Court notes that they are only one factor being considered by the Court in making the ultimate custody determination herein.
Finally, the Court has determined that Defendant has engaged in breach of his contractual obligations set forth within the Parenting Agreement and Stipulation of Settlement and has thus engaged in repeated violations of the Judgment of Divorce. As noted above, despite Defendant's awareness that his Our Family Wizard Communications were being recorded and could be utilized in future Court proceedings, he remained undeterred in his utilizing the application to engage in domestic violence against Plaintiff. Defendant further stated in these messages his lack of respect for Court Orders, causing the Court to question if Defendant will comply with any future orders of this or any other Court, pertaining to A.U. or otherwise. 
Due to the troubling pattern of conduct of Defendant, while the Court recognizes the wishes of A.U. to reside with Defendant, the Court cannot proceed in that manner, but must do what the Court deems to be in the best interests of A.U. The Court believes that one of the most important factors to be considered when making a custody determination is to question which parent will be situated to instill in the subject child or children a strong sense of integrity, [*26]morals, and ethics. Considering the conduct of Defendant, including a pattern of domestic violence and parental alienation against Plaintiff by Defendant, this Court concludes that Plaintiff is the parent better able to provide A.U. with a more stable home environment, where he will be safe and offered the opportunity to develop integrity, morals, and ethics. Accordingly, the Court is left with only one option, and hereby determines that Plaintiff shall take sole physical and legal custody of A.U.
Based upon the submissions made to this Court and the evidence received at trial the Court hereby determines that by reason of a substantial change in circumstances, namely the Defendant's domestic violence against Plaintiff and parental alienation of Plaintiff, the parties' Judgment of Divorce, dated January 8, 2021, which incorporated, but did not merge, the Parenting Agreement, dated September 11, 2020, and Stipulation of Settlement, dated November 13, 2020, shall be modified in the following manner: (a) awarding Plaintiff immediate sole legal and physical custody of A.U.; (b) modifying the regular, summer and holiday access schedules to limit Defendant's right to visitation with the A.U. to a maximum of two visits per week, no longer than two hours each, which shall occur in Westchester County and be supervised by a Court-appointed therapeutic access supervisor with reports to be issued to the Court, the cost of which shall be paid solely by Defendant. To effectuate this provision, the Court hereby appoints the following therapeutic access supervisor: [Redacted], or if this professional is unavailable, another professional shall be appointed by the Court upon request of the parties; and (c) terminating Defendant's telephone access with A.U.
The Court further finds that the passage of four months of Defendant's completion of therapeutic visitation shall be deemed a change in circumstances permitting Defendant or the attorney for A.U. to request a modification of this Decision and Order.
f. Request for Other Relief.
Any relief specifically not granted or otherwise addressed herein is denied.

 * * *
Based upon the foregoing, it is hereby
ORDERED that Family Offense Petition of Defendant commenced in the Westchester County Family Court proceeding known as [Redacted], under File Number [Redacted], Docket Number [Redacted], consolidated in this action pursuant to an Order of Consolidation entered on August 29, 2023, and filed in this action as NYSCEF Document Number 122 is hereby dismissed entirely; and it is further
ORDERED that any orders of protection issued against Plaintiff pertaining to Defendant and/or A.U., including but not limited to NYSCEF Document Number 147, are hereby vacated; and it is further
ORDERED that the Defendant is determined to have constituted a family offense of harassment in the second degree against Plaintiff, resulting in this Court entering simultaneously with the entry of this Decision and Order an Order of Protection against Defendant in favor of Plaintiff, which shall remain in effect until July 9, 2029, directing the following: [J.U.] (D.O.B.: [Redacted]) shall observe the following conditions: (a) Stay away from [L.W.] (D.O.B.: [Redacted]) except to effectuate parental access time as set forth herein or in future Decisions and Orders of this Court; (b) Stay away from the home of [L.W.] (D.O.B.: [Redacted]); (c) Stay away from the business of [L.W.] (D.O.B.: [Redacted]); (d) Stay away from the place of employment of [L.W.] (D.O.B.: [Redacted]); (e) Refrain from communication or any other contact by mail, telephone, e-mail, voicemail, social media or other electronic or any other [*27]means, with [L.W.] (D.O.B.: [Redacted]), except for texts and e-mails regarding the parties' minor Child A.U. (D.O.B.: [Redacted]); and (f) Refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, strangulation, criminal obstruction of breathing or circulation, disorderly conduct, criminal mischief, sexual abuse, sexual misconduct, forcible touching, intimidation, threats, identity theft, grand larceny, coercion, unlawful dissemination or publication of intimate image(s) or any criminal offense against [L.W.] (D.O.B.: [Redacted]); (g) Surrender any and all handguns, pistols, revolvers, rifles, shotguns and other firearms owned or possessed; and do not obtain any further guns or firearms. Such surrender shall take place immediately, but in no event later than July 12, 2024: at [Redacted]; and (h) it is further ordered that the above-named license to carry, possess, repair, sell or otherwise dispose of a firearm or firearms pursuant to Penal Law § 400.00 is suspended; and the above-named shall remain ineligible to receive a firearm license while this Order is in effect (with a copy of this Order of Protection to be served upon [Redacted]); and it is further
ORDERED that the Court further finds it appropriate to enter a second Order of Protection for the benefit of A.U. against Defendant, restraining Defendant for a period of five years which shall terminate on July 9, 2029, in the following manner: [J.U.] (D.O.B.: [Redacted]) shall observe the following conditions: Refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, strangulation, criminal obstruction of breathing or circulation, disorderly conduct, criminal mischief, sexual abuse, sexual misconduct, forcible touching, intimidation, threats, identity theft, grand larceny, coercion, unlawful dissemination or publication of intimate image(s) or any criminal offense against A.U. (D.O.B.: [Redacted]); and it is further
ORDERED that Defendant is in breach of the parties' Judgment of Divorce, dated January 8, 2021, which incorporated, but did not merge, the Parenting Agreement, dated September 11, 2020, and Stipulation of Settlement, dated November 13, 2020, by his willful failure and refusal to abide by the access schedule set forth therein; and it is further
ORDERED that the parties' Judgment of Divorce, dated January 8, 2021, which incorporated, but did not merge, the Parenting Agreement, dated September 11, 2020, and Stipulation of Settlement, dated November 13, 2020, shall be modified in the following manner: (a) awarding Plaintiff immediate sole legal and physical custody of A.U. (D.O.B.: [Redacted]); (b) modifying the regular, summer and holiday access schedules to limit Defendant's right to visitation with the A.U. (D.O.B.: [Redacted]), to a maximum of two visits per week, no longer than two hours each, which shall occur in Westchester County and be supervised by a Court-appointed therapeutic access supervisor with reports to be issued to the Court, the cost of which shall be paid solely by Defendant. To effectuate this provision, the Court hereby appoints the following therapeutic access supervisor: [Redacted], or if this professional is unavailable, another professional shall be appointed by the Court upon request of the parties; and (c) terminating Defendant's telephone access with A.U. (D.O.B.: [Redacted]); and it is further
ORDERED that the Court further finds that the passage of four months of Defendant's completion of therapeutic visitation shall be deemed a change in circumstances permitting Defendant or the attorney for A.U. (D.O.B.: [Redacted]) to request a modification of this Decision and Order; and it is further
ORDERED that Plaintiff shall be the sole custodian of any passports of the Child A.U. (D.O.B.: [Redacted]), issued by any jurisdiction, shall be the only parent permitted to apply for or seek to renew passports of the Child A.U. (D.O.B.: [Redacted]), and to effectuate this [*28]Defendant shall within ten (10) days of the Notice of Entry of this Decision turn over to Plaintiff by traceable overnight delivery any Passports for the Child A.U. (D.O.B.: [Redacted]), in the possession of Defendant; and it is further
ORDERED that Plaintiff shall serve this Decision and Order with Notice of Entry on Defendant within ten (10) days of the date of this Decision and Order, and shall file an Affidavit of Service within ten (10) days of the date of this Decision and Order; and it is further
ORDERED that to the extent any relief sought has not been granted, it is expressly denied.
The foregoing constitutes the Decision and Order of the Court. 
Dated: July 9, 2024
White Plains, New York
HON. JAMES L. HYER, J.S.C.

Footnotes

Footnote 1:Transcript citations refer to the consolidated transcript filed with the Court by Plaintiff's counsel.